UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

QUIK FIND PLUS, INC.,                    )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )      No.:   3:09-CV-184
                                         )             (VARLAN/GUYTON)
PROCON, INC., BRIAN BOLING,              )
TIM WELCH, and JIM GIAMMARCO,            )
                                         )
            Defendants.                  )

## MEMORANDUM OPINION AND ORDER

        This civil action is before the Court on the Motion to Dismiss on Behalf of Procon,

Inc.; Brian Boling; Tim Welch; and Jim Giammarco [Doc. 21], in which defendants request

the dismissal of plaintiff's amended complaint in its entirety for failure to state a claim upon

which relief can be granted or, in the alternative, the dismissal of the claims against

defendant Jim Giammarco for lack of personal jurisdiction.  Plaintiff has filed a reponse to

the motion to dismiss [Doc. 25].  Defendants have filed a reply to the response [Doc. 26].

        This matter is now ripe for the Court's consideration.

## I.      Background

        Plaintiff filed the original complaint in this case on April 28, 2009 [Doc. 1].  Plaintiff

filed an amended complaint on October 13, 2009 [Doc. 19].   In the amended complaint,

plaintiff alleges as follows: plaintiff is a Canadian corporation [*Id.*, ¶ 1].  Defendant Procon,

Inc. ("Procon") is a Tennessee corporation, with its principal place of business in Knoxville

[*Id.*, ¶ 2].  Defendant Brian Boling is the Chairman and Chief Executive Officer of Procon

[*Id.*, ¶ 3]. Defendant Tim Welch is the Chief Operating Officer of Procon [*Id.*, ¶ 4]. Defendant Jim Giammarco is the Vice President of National Accounts of Procon [*Id.*, ¶ 5].

In the fall of 2006, plaintiff was advised that Credit Acceptance Corporation ("CAC"), a lender in the sub-prime automotive market, was looking for a stronger provider of a product known as a "Global Positioning System/Starter Interrupter Device" (a "GPS/SID") as a result of technical failures and insufficient marketing support from its GPS/SID provider at the time [*Id.*, ¶¶ 7, 10]. A GPS/SID is a device that is installed underneath the dashboard of motor vehicles purchased by certain consumers in the sub-prime auto market [*Id.*, ¶ 8]. The device permits lenders who front money to facilitate the sale of motor vehicles to track the vehicles, and audibly reminds customers when a payment is due [*Id.*]. If the customer fails to pay after the warning is issued, the device can disable the starter, and can help the lender find and repossess the motor vehicle [*Id.*]. Several different companies manufacture GPS/SIDs, which have been in the market in some form since 2002 [*Id.*, ¶ 9].

Plaintiff, through its employees and agents, began investigating different providers who could potentially furnish CAC with the technological capabilities it needed to provide CAC and its dealer-partners with account management, marketing skills, and customer services [*Id.*, ¶ 11]. In early 2007, plaintiff's General Manager, Cliff Coward, contacted Kyle Fjelstad at Procon [*Id.*, ¶ 12]. Mr. Coward had been considering Procon as a potential provider of a GPS/SID system for CAC because of Procon's business dealings with the United States Air Force [*Id.*].

At that time, Procon's GPS/SID did not have the ability to send a warning signal to the consumer prior to disabling the vehicle [*Id.*]. The ability to send such a warning was necessary to comply with "right to cure" laws in various states, which prevented disabling or repossessing a vehicle in this manner without first providing an audible warning [*Id.*]. Mr. Fjelstad assured Mr. Coward that if plaintiff could bring in a significant customer base, Procon would incorporate the warning function into its product [*Id.*].

Mr. Coward had a longstanding relationship with CAC, as well as credibility with certain high-level employees in the company [*Id.*, ¶ 13]. Plaintiff was also familiar with CAC's business model and corporate structure [*Id.*]. Plaintiff arranged for Daniel Neveu, an employee of another GPS/SID provider which had never done business with CAC, but which had experience in the industry, to interview with Procon [*Id.*]. Plaintiff had a relationship of almost two years with Mr. Neveu, and spent a significant amount of time working with him to establish and develop the contractual relationship between plaintiff and Procon [*Id.*, ¶ 18]. Procon hired Mr. Neveu as its Vice President of Sales and Marketing [*Id.*, ¶ 13]. Mr. Neveu brought his customer base to Procon [*Id.*].

Through his contacts at CAC, Mr. Coward determined that CAC was seeking a technically and financially secure provider; a direct relationship with a Tier 1 carrier; the inclusion of adequate airtime in its fixed costs; a marketing "rebate" paid to CAC monthly, rather than as an accrual of unused airtime; a database interface; sales and marketing support for its 2,000 dealer-partners; and customer support for its dealer-partners [*Id.*, ¶ 14]. Procon,

through Mr. Fjelstad, assured Mr. Coward that it could alter its product to meet CAC's needs [*Id.*].

As a result of plaintiff's efforts, CAC began to proceed with due diligence on Procon through the spring and early summer of 2007 [*Id.*, ¶ 15]. Plaintiff prevailed upon Procon to provide the technology with the warning function it was seeking, and began to establish a customer base as a conventional distributor of Procon's goods and services in the United States market [*Id.*]. Mr. Coward worked daily with Mr. Neveu to assemble the program and to begin presenting offers to CAC [*Id.*]. By the summer of 2007, Mr. Coward was receiving positive feedback from CAC about Procon [*Id.*]. CAC ultimately submitted a formal request for a proposal to Procon [*Id.*].

Mr. Fjelstad and Mr. Neveu told Mr. Coward that, before Procon could provide the devices as requested to CAC, plaintiff would have to submit an order [*Id.*]. Accordingly, Mr. Coward purchased the first one hundred of these units in the summer of 2007 [*Id.*]. He began doing business selling these units to various dealers in North Carolina, Delaware, Ohio, and Kansas in the late summer and fall of 2007 [*Id.*]. By December 2007, plaintiff was selling two hundred units per month, with a margin of fifty dollars per device [*Id.*].

Shortly after the end of 2007, however, plaintiff encountered "systemic internal problems" with Procon which caused plaintiff "great concern" with respect to the business relationship between it and Procon [*Id.*]. Mr. Coward and others contacted persons at Procon in an attempt to critique and modify Procon's technical support and marketing practices, which plaintiff believed would thwart any long-term relationship between Procon and CAC

[*Id.*].  Mr. Coward later "stepped up" his efforts to educate Procon as to various aspects of CAC's business; these included CAC's philosophical overview of CAC's dealers and their concerns, and of CAC's corporate structure and business model; and the activities, issues, and functions of CAC's partners [*Id.*, ¶ 18].  Plaintiff also assembled a website promoting Procon, and contracted with a webmaster and accounting firm to facilitate the relationship between Procon and CAC [*Id.*, ¶ 24].  Procon officials, including Mr. Boling and Mr. Welch, began increasingly to rely upon Mr. Coward and others in plaintiff's organization in order to secure CAC's business in the GPS/SID market [*Id.*, ¶ 16].

Throughout 2008, Mr. Boling, Mr. Welch, and other officials at Procon repeatedly promised Mr. Coward and plaintiff that plaintiff would be the account manager for the CAC project, and would be paid sixteen dollars per device for account service [*Id.*, ¶ 17].  Mr. Welch assured plaintiff and Mr. Coward that plaintiff would perform the account management function as long as plaintiff was interested in doing so, because Procon had no interest in performing that function itself [*Id.*].  But for these assurances, plaintiff would not have involved itself with, or facilitated any agreement between, Procon and CAC [*Id.*].

Procon eventually hired Mr. Giammarco, who was previously employed by CAC, as Procon's Vice President of National Accounts [*Id.*, ¶ 19].  In an October 16, 2008 email, Mr. Welch announced that Mr. Giammarco would lead, and would primarily focus upon, CAC accounts, which were "going to flourish on November 1, 2008" [*Id.*].  Shortly after Procon hired Mr. Giammarco, but before the launching of Procon's relationship with CAC, Mr. Giammarco and others conspired to remove plaintiff from any role in the management of the

CAC account, in order to increase Procon's margin [*Id.*, ¶ 20].  On October 29, 2008, Mr. Giammarco called Mr. Coward to inform him that Mr. Boling and Mr. Welch had decided that plaintiff "would have no role to play in the CAC" account [*Id.*, ¶ 21].  Mr. Giammarco further advised Mr. Coward that Procon was bringing the CAC project "in-house" [*Id.*].

On or about November 3, 2008, Mr. Coward submitted a letter to Mr. Welch regarding plaintiff's alleged agreement with defendants [*Id.*, ¶ 22].  Mr. Welch responded by denying the existence of any agreement between the parties; retroactively terminating the distributorship agreement between plaintiff and Procon as of May 2008; leaving plaintiff with $16,000 of Procon equipment that plaintiff cannot sell; and owing plaintiff $4,000 in earned profit [*Id.*].  On the basis of these allegations, plaintiff brings four claims: breach of contract, detrimental reliance, unjust enrichment, and fraud or misrepresentation [*Id.*, ¶¶ 25-34].  Plaintiff requests a judgment against defendants of $25,000,000.00 in compensatory damages and $50,000,000.00 in punitive damages [Doc. 19].

Defendants filed a motion to dismiss on November 12, 2009 [Doc. 21], in which they argue that plaintiff's amended complaint should be dismissed in its entirety for failure to state a claim upon which relief can be granted.  Defendants argue in the alternative that plaintiff's claims against Mr. Giammarco should be dismissed for lack of personal jurisdiction [*Id.*].  Plaintiff filed a response to the motion to dismiss on December 11, 2009 [Doc. 25].  Defendants filed a reply to the response on December 18, 2009 [Doc. 26].

The Court has carefully considered the motion to dismiss, the response, and the reply in light of the applicable law. For the reasons that follow, the motion to dismiss will be denied.

## II.     Standard of Review

Federal Rule of Civil Procedure 8(a)(2) sets out a liberal pleading standard. *Smith v. City of Salem*, 378 F.3d 566, 576 n.1 (6th Cir. 2004). Rule 8(a)(2) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the [opposing party] fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555. A formulaic recitation of the elements of a cause of action will not do. *Id.* Nor will an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A pleading must instead "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "Determining whether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires th[is Court] to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1937.

## III.     Analysis

Defendants request dismissal of the amended complaint in this case for failure to state a claim as to each of plaintiff's claims. Defendants move in the alternative for dismissal of

plaintiff's claims against Mr. Giammarco for lack of personal jurisdiction. The Court first considers the arguments for dismissal as to each of plaintiff's claims. It then considers the personal jurisdiction question.

## A.       Breach of Contract Claim

As noted, plaintiff brings a breach of contract claim against defendants. Defendants argue that this claim should be dismissed because the amended complaint fails to allege facts sufficient to establish the existence of a contract [Doc. 22]. Defendants argue further that, even if the complaint does allege facts sufficient to establish the existence of a contract, the alleged contract does not satisfy the statute of frauds [*Id.*]. Plaintiff argues in response that the complaint does allege facts sufficient to establish the existence of a contract [Doc. 25-1]. Plaintiff argues further that this contract does satisfy the statute of frauds [*Id.*].

The Court agrees with plaintiff. The elements of a breach of contract claim in Tennessee are (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of the contract. *C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676-77 (Tenn. Ct. App. 2007). To be enforceable, a "contract 'must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration . . . and [must be] sufficiently definite.'" *Vatt v. James*, 180 S.W.3d 99, 108 (Tenn. Ct. App. 2005) (quoting *Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Local # 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991)). "Consideration may be either a benefit to the promisor or a detriment to, or

an obligation upon, the promisee." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 n.3 (Tenn. 2008).

Viewed in the light most favorable to plaintiff, the allegations in the amended complaint satisfy the elements above. Plaintiff alleges that Mr. Coward was "repeatedly promised by [d]efendants Boling, Welch, and other officials at Procon . . . that [p]laintiff would be the Account Manager for the CAC project," and "would be paid sixteen dollars . . . per device for account service" [Doc. 19, ¶ 17]. Plaintiff further alleges that these promises are "memorialized by numerous e-mails between Mr. Coward and officials at Procon . . . including [d]efendants Welch and Boling" [*Id.*]. These allegations suffice in providing evidence of a "meeting of the minds" between plaintiff and these officials that plaintiff would serve as account manager and would be paid for performing that service.[1]

The Court also finds that these promises are supported by valuable consideration. Plaintiff alleges that Mr. Coward "contacted various individuals at Procon . . . [in an attempt] to modify and critique Procon's . . . technical support and marketing practices," and "stepped up his efforts to educate Procon" on a variety of aspects of CAC [*Id.*, ¶¶ 15, 16]. These activities represent a "detriment to" or "obligation upon" plaintiff constituting valuable consideration. Viewed in the light most favorable to plaintiff, plaintiff has alleged facts sufficient to entitle it to relief under a breach of contract claim.

---

[1] Because defendants argue that no contract existed, they do not analyze whether the alleged contract was breached or whether damages resulted from that breach.

The Court is not persuaded by defendants' argument that the alleged contract is not enforceable because it does not satisfy the statute of frauds. Tennessee Code Annotated § 29-2-101(a)(5) provides that:

> No action shall be brought [u]pon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract; unless the promise or agreement, upon which such action shall be brought . . . shall be in writing, and signed by the party to be charged therewith.

This writing must also "contain the essential terms of the contract, expressed with such certainty that they may be understood from the [writing] itself . . . without resorting to parol evidence." *Kelso Oil Co. v. E.W. Truck Stop*, 102 S.W.3d 655, 658 (Tenn. Ct. App. 2002). Defendants argue that the contract fails to satisfy the statute of frauds because "the parties did not intend for the contract to be performed within one year," and because the amended complaint "only alleges that 'numerous' and 'multiple' and 'a series of' e-mails memorialize the purported contract . . . but does not allege any statement or any particular e-mail that would plausibly suggest that the e-mails . . . contain all of the essential terms of the contract" [Doc. 22].

Defendants' first argument misapprehends the one-year limitation under the statute of frauds. The question is not, as defendants argue, whether the parties "intend[ed] for the contract to be performed within one year," *see* Doc. 22, but whether the Court "can say that in no reasonable probability can [the] agreement be performed within the year." *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924, 932 (Tenn. Ct. App. 1984). Plaintiff's amended complaint alleges that Mr. Welch assured Mr. Coward that "the agreement to have [p]laintiff

perform [the account management function] would survive as long as [p]laintiff was interested" [Doc. 19, ¶ 17]. Because plaintiff could have lost interest in performing this function within one year, the contract falls within the statute of frauds. *See also Price*, 682 S.W.2d at 932 (noting that courts in Tennessee "have declined to construe a contract to require performance over more than one year if to do so would render the contract unenforceable because of the statute of frauds.").

Further, as defendants correctly explain in their response, "[b]ecause the contract between the [p]laintiff and [d]efendant[s] is not subject to the statute of frauds, a writing is not required" [Doc. 25-1]. As a consequence, plaintiff need not demonstrate that the emails to which plaintiff refers in the amended complaint contain all of the essential terms of the contract. The Court will therefore deny defendants' request for dismissal of the breach of contract claim in plaintiff's amended complaint.

The Court now considers defendants' request for dismissal of plaintiff's claim for detrimental reliance.

**B.     Detrimental Reliance Claim**

Plaintiff also brings a detrimental reliance claim against defendants. Tennessee courts refer to claims of detrimental reliance and promissory estoppel interchangeably. *Shedd v. Gaylord Entm't Co.*, 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003). These claims arise when there is a "promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee," and when the

promise "does induce such action or forbearance." *Id.* In these situations, the promise is binding "if injustice can be avoided only by enforcement of the promise." *Id.*

The Court has no difficulty finding detrimental reliance on the facts before it when those facts are viewed in the light most favorable to plaintiff. Plaintiff alleges in the amended complaint that "[d]efendants, [and] their employees and agents, repeatedly promised the [p]laintiff that it would be the account manager for the Procon, Inc./CAC business relationship and that it would be paid sixteen dollars . . . per device" [*Id.*]. Plaintiff further alleges that it "relied upon these repeated promises by the [d]efendants" [Doc. 19, ¶ 30]. Plaintiff finally alleges that, in reliance upon these promises, it "substantially changed its position by the expenditure of money, the shutting down of its existing businesses in order to perform the account management function, and the forgoing of other business" opportunities [*Id.*]. These facts suffice to make out a prima facie case of detrimental reliance in Tennessee. The Court will therefore deny defendants' request for dismissal of the detrimental reliance claim in plaintiff's amended complaint.

The Court now considers defendants' request for dismissal of plaintiff's claim for unjust enrichment.

### C.    Unjust Enrichment Claim

Plaintiff also brings an unjust enrichment claim against defendants. The elements of an unjust enrichment claim are (1) a benefit conferred upon the defendant by the plaintiff; (2) the appreciation by the defendant of such benefit; and (3) the acceptance of the benefit under circumstances such that it would be inequitable for him to retain the benefit without

12

payment of the value thereof. *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). Defendants first argue that plaintiff's claim for unjust enrichment must fail because plaintiff did not confer a benefit on defendants.

The Court disagrees. Plaintiff's amended complaint alleges that plaintiff "formulated the idea and performed substantial work to facilitate the business relationship between" Procon and CAC "concerning the manufacture, sales, and marketing of the GPS/SID" [Doc. 19, ¶ 32]. The "substantial work" to which plaintiff refers includes plaintiff's expenditure of several thousand dollars over the course of twenty-two months to set up the Procon/CAC business arrangement; plaintiff's construction of a website promoting Procon; plaintiff's contracting with a webmaster and accounting firm to facilitate the Procon/CAC relationship; plaintiff's organization of multiple persons in Canada to act as agents; and plaintiff's assembly of a team of people in the United States to act as agents and to provide customer support for the CAC account [*Id.*, ¶ 24]. Viewed in the light most favorable to plaintiff, these allegations constitute a benefit conferred upon defendants by the plaintiff.

Defendants also argue that, even if plaintiff has provided sufficient factual allegations to demonstrate that plaintiff conferred a benefit on defendants, it would not be inequitable for defendants to retain this benefit because defendants provided consideration for plaintiff's services [Doc. 22]. Defendants contend that plaintiff was a conventional distributor of Procon's goods and services in the U.S. market [*Id.*]. Defendants argue that, as a

conventional distributor, plaintiff purchased Procon's products, began doing business with various dealers in North Carolina, Delaware, Ohio, and Kansas, and was compensated for its distribution efforts at the rate of fifty dollars per device sold [*Id.*].

Defendants' argument misses the mark. Plaintiff's unjust enrichment claim is brought with reference to the account management services plaintiff alleges it provided to defendants. Defendants have pointed to no evidence that they compensated plaintiff for providing these services. The products to which defendants refer, and for which defendants contend plaintiff was compensated at the rate of fifty dollars per device sold, were purchased by plaintiff pursuant to the distributorship in effect between plaintiff and Procon. As defendants themselves recognize in their reply brief, "[a]ny transactions conducted pursuant to the distributorship agreement between Procon and [p]laintiff are irrelevant to the subject matter of this litigation as [p]laintiff does not allege any cause of action related to the distributorship agreement" [Doc. 26]. The Court will therefore deny defendants' request for dismissal of the unjust enrichment claim in plaintiff's amended complaint.

The Court now considers the request for dismissal of plaintiff's fraud claim.

### D. Fraud/Misrepresentation Claim

Finally, plaintiff brings a "fraud or misrepresentation" claim against defendants. "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The elements of a fraud claim in Tennessee are: (1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the

representation's falsity, *i.e.*, that the representation was made in the knowledge that it was false, or with reckless disregard for its truth; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation embodies a promise of future action without the present intention to carry out the promise. *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998).

Defendants argue that plaintiff's amended complaint fails to state allegations as to elements (2) and (4). The Court considers each prong below.

### 1. Whether the Representation Was Made in the Knowledge that it Was False, or with Reckless Disregard for its Truth

Defendants first argue that plaintiff's amended complaint contains no allegations that any of the defendants made a representation with the knowledge that it was false or with reckless disregard for its truth [Doc. 22]. The Court disagrees. In the amended complaint, plaintiff alleges that, "[a]fter being presented with the idea of a business relationship between Procon and CAC, [d]efendants intentionally misrepresented to the [p]laintiff that the [p]laintiff would perform the account management function of that relationship" [Doc. 19, ¶ 34]. Plaintiff further alleges that plaintiff was to "receive sixteen dollars . . . per device as compensation" for performing that function [*Id.*]. Plaintiff finally alleges that, "at the time [d]efendants made the[se] misrepresentations to the [p]laintiff, the [d]efendants knew that the representations were false as the [d]efendants had no intention of performing the agreement or utilizing [p]laintiff's services as an account manager" [*Id.*]. Plaintiff alleges that these misrepresentations were made to "ensure that the [p]laintiff continued to facilitate Procon's

business relationship with CAC," and "that the [p]laintiff performed all necessary work to facilitate the Procon, Inc./CAC agreements" [*Id.*].

Viewing these allegations in the light most favorable to plaintiff, and taking into consideration Rule 9(b)'s instruction that an intent element like this one may be alleged "generally," the Court finds that plaintiff has alleged facts sufficient to make out a prima facie case that defendants made a representation in the knowledge that it was false, or with reckless disregard for its truth.

The Court now considers defendants' arguments as to element (4).

## 2. Whether the Misrepresentation Embodies a Promise of Future Action Without the Present Intention to Carry Out the Promise

Defendants next argue that, even if the amended complaint raises allegations that the defendants made a representation in the knowledge that it was false or with reckless disregard for its truth, the complaint nevertheless contains no allegations that defendants made that representation without the present intention to carry out the promise it contained [Doc. 22]. More specifically, defendants argue that the complaint "fails to allege anything other than [p]laintiff's subjective belief that [d]efendants made the alleged statements with the present intent not to perform" [*Id.*].

The Court disagrees. Plaintiff in this case has alleged that defendants made these misrepresentations "to ensure that the [p]laintiff continued to facilitate Procon's business relationship with CAC" [Doc. 19, ¶ 34]. Plaintiff further offers Procon's hiring of Mr. Giammarco, and its subsequent announcement that Mr. Giammarco would focus on the CAC

account, as evidence that Procon did not in fact intend to honor its promise that plaintiff would manage the CAC account for defendants [*Id.*, ¶ 19]. It is well settled in Tennessee that circumstantial evidence may suffice to establish fraud. *Vela v. Beard*, 59 Tenn. App. 544, 560 (Tenn. Ct. App. 1968) (citing 37 C.J.S. *Fraud* § 115). Thus, viewing these allegations in the light most favorable to plaintiff, the Court finds that plaintiff has alleged facts sufficient to make out a prima facie case that defendants made a promise of future action without the present intention to carry it out. The Court will therefore deny defendants' request for dismissal of the fraud/misrepresentation claim in plaintiff's amended complaint.

The Court now considers defendants' motion to dismiss the claims in plaintiff's amended complaint against Mr. Giammarco for lack of personal jurisdiction.

### E. Personal Jurisdiction

Finally, defendants argue that this Court cannot exercise personal jurisdiction over Mr. Giammarco. In order for a district court to have personal jurisdiction over a party to a suit who is not present in the forum state, the party must have "minimum contacts" with the forum state such that maintaining the suit would not "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "The critical question minimum-contacts analysis seeks to answer is whether 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Third Nat'l Bank v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). In a diversity case, a federal

court determines whether personal jurisdiction exists over a nonresident defendant by applying the law of the state in which it sits. *WEDGE Group, Inc.*, 882 F.2d at 1089.

The due process limitations on the exercise of personal jurisdiction command a distinction between "general" jurisdiction and "specific" jurisdiction. "In a case of general jurisdiction, a defendant's contacts with the forum state are of such a 'continuous and systematic' nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Id.* In a specific jurisdiction case, by contrast, 'a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).

In a specific jurisdiction case, the Court must engage in a two-step process. First, it must determine whether any of Tennessee's relevant long-arm statutes authorizes the exercise of jurisdiction over the nonresident defendant. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007). If so, the Court must then determine whether the exercise of that jurisdiction comports with constitutional due process. *Id.* Tennessee's long-arm statute provides that persons who are nonresidents of Tennessee are subject to the jurisdiction of Tennessee courts as to any action or claim for relief arising from any tortious act in Tennessee. Tenn. Code. Ann. § 20-2-214. The Tennessee long-arm statute extends "to the full limit allowed by due process." *Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985). The relevant Tennessee long-arm statute thus authorizes the

exercise of jurisdiction over Mr. Giammarco, provided that such exercise comports with due process.

As for the due process inquiry, the Sixth Circuit applies a well-settled three-part test in determining whether specific personal jurisdiction may be exercised in a given case:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). *See also Safetech*, 503 F.3d at 550-55 (applying *Mohasco* test). The plaintiff bears the burden of establishing that jurisdiction exists in a given case. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

Defendants first argue that Mr. Giammarco lacks "continuous and systematic contacts" with Tennessee such that the exercise of general personal jurisdiction over him would be improper. In support of this argument, defendants have filed an affidavit sworn out by Mr. Giammarco, in which Mr. Giammarco states that he:

> (1)  Is an Ohio resident;
>
> (2)  Is not a Tennessee resident;
>
> (3)  Does not own or lease any property in Tennessee;
>
> (4)  Does not have a bank account with a Tennessee state bank or a bank located within Tennessee;
>
> (5)  Does not pay taxes in Tennessee;

(6)     Is not registered to vote in Tennessee;

(7)     Has not made an appearance in any court for any action under any circumstances in Tennessee;

(8)     Has only been physically present in Tennessee on three occasions in the past five years, including in October 2008 to interview for his present position with Procon;

(9)     Does not maintain an office at Procon's office, or at any other location, within the geographical boundaries of Tennessee;

(10)    Conducts all of his work for Procon from his office in Ohio;

(11)    Does not have any other connection to Tennessee; and

(12)    Was not present in Tennessee when he placed telephone calls or sent emails related to the controversy in this case.

[Doc. 21-1]. Although plaintiff argues that Mr. Giammarco "has had sufficient minimum contacts within the state of Tennessee such that this Court should exercise jurisdiction over" him, *see* Doc. 25-1, this Court cannot agree. Mr. Giammarco's lack of continuous and systematic contacts with Tennessee, as evinced by the facts listed above, and as unrebutted by any factual allegations raised by plaintiff, prohibits this Court from exercising general personal jurisdiction over him.

As mentioned, however, this Court may still exercise specific personal jurisdiction over Mr. Giammarco if the three prongs of the *Mohasco* test are satisfied. The first prong asks whether the defendant "purposefully availed" himself of the privilege of acting in the forum state. The "purposeful availment" question "is 'the sine qua non for in personam jurisdiction.'" *Compuserve, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (quoting

*Mohasco*, 401 F.2d at 381-82). Jurisdiction over individual officers in a corporation cannot be predicated solely upon jurisdiction over the corporation. *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 698 (6th Cir. 2000) (quoting *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974)). But the exercise of jurisdiction is proper, as limited by "traditional notions of fair play and substantial justice," where the "out-of-state agent is actively and personally involved in the conduct giving rise to the claim." *Balance Dynamics Corp.*, 204 F.3d at 698.

Upon application of the *Mohasco* factors, the Court finds the exercise of specific personal jurisdiction over Mr. Giammarco to be appropriate in this case. The Court first finds that Mr. Giammarco "purposefully availed" himself of the privilege of acting in Tennessee. While Mr. Giammarco avers that he "was not present in the state of Tennessee when [he] placed any telephone calls or emails to the [p]laintiff that are at issue in this controversy," he does aver that he placed those telephone calls and sent those emails [Doc. 21-1]. These communications, as plaintiff alleges in the amended complaint, are central to the "conspiracy" to replace plaintiff with Mr. Giammarco as the account manager for CAC.[2] In the Sixth Circuit, "[t]he acts of making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant where the

_____

[2] Plaintiff alleges in the amended complaint that Mr. Giammarco, by these communications, took "an active role [in] . . . unlawfully breaching [d]efendant Procon, Inc.'s contract with [p]laintiff and reneging on other promises to [p]laintiff" [Doc. 19, ¶ 5]. Plaintiff further alleges that Mr. Giammarco "had multiple telephone contacts with employees of Procon, Inc. who were in Tennessee at the time, which led to the decision to breach [p]laintiff's contract and engage in unlawful conduct detrimental to" plaintiff [*Id.*].

phone calls and faxes form the [basis] for the action." *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001). Where such communications are "at the heart of the lawsuit," and are not "merely incidental communications sent by the defendant into Tennessee," a corporate agent can be said to have purposefully availed himself of the forum. That is the case here. The Court thus finds that the first factor of the *Mohasco* test is satisfied.

With respect to the second *Mohasco* factor, the Court finds that the cause of action in this case arose from Mr. Giammarco's activities in Tennessee. Plaintiff has set forth allegations in the amended complaint tying Mr. Giammarco's communications to persons in Tennessee to the decision to replace plaintiff as account manager for CAC. As noted, that decision is central to plaintiff's case. As the Sixth Circuit has held with respect to the second *Mohasco* factor, "when a foreign defendant purposefully directs communications into the forum that cause injury within the forum, and those communications form the 'heart' of the cause of action, personal jurisdiction may be present over that defendant without defendant's presence in the state." *Id.* at 333. The Court thus finds the second factor of the *Mohasco* test to be satisfied as well.

The final *Mohasco* factor asks whether the acts of the defendant or the consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Mohasco*, 401 F.2d at 381. Where the first two factors of the *Mohasco* test are satisfied, an inference of reasonableness arises. *Compuserve*, 89 F.3d at 1268. When deciding whether it is reasonable to exercise personal jurisdiction over a non-resident defendant, courts consider, among other factors, (1) the

burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy. *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005).

Applying these factors, the Court finds the exercise of personal jurisdiction over Mr. Giammarco to be reasonable in this case. While Mr. Giammarco avers that "[d]efending a lawsuit in the state of Tennessee would place an unreasonable burden upon [him] because [his] residence is in Ohio, [his] workplace is in Ohio, and any evidence regarding [his] contacts with the [p]laintiff is located in Ohio," *see* Doc. 21-1, the Sixth Circuit has "deemed specific jurisdiction to be proper even when a defendant would be compelled to travel." *Id.* (citing *Youn v. Track, Inc.*, 324 F.3d 409, 420 (6th Cir. 2003)). Tennessee has an interest in the case, given that the communications at issue form part of the basis of the suit and were directed to persons in Tennessee. Plaintiff has an interest in obtaining relief in this case. Finally, it appears that Tennessee provides the most likely forum in which the controversy may be efficiently resolved, given that the allegedly tortious conduct either took place in, or was directed toward, Tennessee. For these reasons, and in satisfaction of the third factor of the *Mohasco* test, the Court thus finds the exercise of jurisdiction over Mr. Giammarco to be reasonable in this case. Defendants' request for dismissal of Mr. Giammarco as a party to this case will therefore be denied.

## IV.    Conclusion

For the reasons above, the Motion to Dismiss on Behalf of Procon, Inc.; Brian Boling;

Tim Welch; and Jim Giammarco [Doc. 21] is **DENIED**.

IT IS SO ORDERED.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE